UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KEVIN QUATTLEBAUM<br>    and<br>GIOVANNI ENRICO WILLIAMS,<br><br>Defendants. | Criminal Action No. 07-235 (JDB) |

**MEMORANDUM AND ORDER**

Following a jury trial that concluded on November 29, 2007, defendant Kevin Quattlebaum was convicted of possession with intent to distribute 188 grams of cocaine base in violation of 21 U.S.C. § 841(a)(1) on December 4, 2007.[1] Following the close of the government's evidence at trial, defendant made a motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29(b). The Court reserved judgment on that question at the time. Defendant now renews his motion for acquittal pursuant to Fed. R. Crim. P. 29(b) and, alternatively, moves for a new trial on the basis of insufficient evidence to support the jury's verdict pursuant to Fed. R. Crim. P. 33. The government opposes both grounds to disturb the jury's verdict. Upon careful consideration, and for the reasons set forth below, the Court will deny defendant's motion.

---

[1] On December 3, 2007, the jury found defendant Giovanni Williams not guilty of the same offense.

## BACKGROUND

The evidence at trial established the following. On August 17, 2007, undercover Metropolitan Police Department ("MPD") officers observed defendants Quattlebaum and Williams walking towards a 2005 Ford F-150 pick-up truck (owned and registered to Quattlebaum) in northeast Washington, D.C. Williams entered the truck on the driver's side and Quattlebaum entered on the passenger's side. After they entered the F-150, Officer Hampton Durham viewed -- through the rear windshield of the truck -- Quattlebaum making a "counting gesture" towards Williams while seated on the passenger side of the vehicle. Defendants soon departed and began to drive north on 19th Street, NE. At the intersection of 19th and Lyman Place, Officer Durham observed the F-150 make a left turn allegedly without employing its traffic signal. That transgression was also observed by other members of the undercover team, and at that point the decision to stop the vehicle was broadcast over a non-recorded radio channel.

Sergeant Neill performed the stop and he was promptly joined by Officer Foultz and Lt. Wilkins. Upon approaching the vehicle, Lt. Wilkins noted the distinct odor of burnt marijuana emanating from the truck, which he believed gave him probable cause to perform a search of the vehicle's interior. Although Lt. Wilkins's search did not ultimately reveal any traces of marijuana in the truck, he did find large chunks of crack cocaine located in a grey bag stuffed inside of a Nike shoe found on the rear floorboard of the F-150. Defendants were then placed under arrest.

In addition to the cocaine base, the officers found a digital scale and a collection of multiple cellular telephones. At the time they were arrested, Quattlebaum and Williams had $300 and $1700 on their persons, respectively. The government commissioned a forensic investigation of the Nike shoes that housed the cocaine. Amy Jeanguenat, a DNA analyst, concluded that defendant Quattlebaum was the primary contributor of the majority of the DNA found in the shoe.

Defendants were charged with unlawful possession with intent to distribute more than 50 grams of cocaine base.

At trial, the government presented a variety of evidence. To begin with, the government called several of the undercover officers to testify to the circumstances of the traffic stop and subsequent search of defendant's vehicle described above. The government also called Ms. Jeanguenat to testify to the results of the DNA analysis. Expert testimony by Anthony Washington established that the wholesale value of the crack at issue was $4,500 - $5,000, the ultimate "street" value of which was $25,000. Detective Washington further testified that drug dealers often stash contraband in their shoes due to their belief that some individuals regard shoes as unhygienic, thus making them unlikely items to be disturbed or searched by others. Significantly, Detective Washington also testified that digital scales of the type recovered from defendant's vehicle are frequently used in narcotics transactions. He stated, moreover, that drug deals routinely occur within automobiles and typically proceed on a strictly cash basis. Finally, Detective Washington testified that non-subscriber cellular telephones, a characteristic attributed to some of the phones discovered in defendant's truck, are often employed by drug distributors in an effort to conceal their communications from law enforcement officials. The parties stipulated that no usable fingerprint evidence was recovered from the drugs and accompanying paraphernalia.

Defendants then offered their own evidence. Quattlebaum produced testimony that established that he often permitted other individuals to drive the truck in connection with his cleaning service, including an individual known as "David." Defense evidence also demonstrated that Quattlebaum and his son, Kevin Jackson, had recently returned from Miami. Quattlebaum drove a U-haul truck back with his wife's belongings, while Jackson and other friends of his drove

the F-150 truck.  Upon their return to the District on the eve of defendants' arrest, Kevin Jackson went out for the evening in his father's F-150.  The next morning, Kevin Jackson testified that he returned the truck and the keys to David.  That account was corroborated by Ernest Wilson-Brown, a friend of Kevin Jackson.  Next, Kimberly Juggins testified that she saw David give the keys to the truck to Quattlebaum on the afternoon in question.  Moreover, Benita Williams testified that she gave several asthma inhalers to Quattlebaum on the day of his arrest at some time between 1 and 4 p.m. in the afternoon.

Finally, Quattlebaum took the stand and testified that he returned to Washington, D.C. on August 16, 2007.  He explained that he had an altercation with David on that evening regarding money concerning a job that David had done in connection with Quattlebaum's cleaning business.  Quattlebaum also explained that he gave the F-150 to Kevin Jackson to use on that evening.  The next day, Quattlebaum testified that he directed Kevin Jackson to give the keys of the vehicle to David.  Later on in the afternoon, Quattlebaum testified that he returned to L Street, NE with Williams to retrieve the truck.  He indicated that when he entered the vehicle on the passenger side, he shook his asthma inhaler several times before departing northbound with Williams.

## STANDARD OF REVIEW

Fed. R. Crim. P. 29(b) provides that, following the close of the government's evidence (or, alternatively, all of the evidence in the case), a court must "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(b).  The test is whether the evidence presented at trial, viewed in the light most favorable to the government, "is sufficient to sustain a conviction as a matter of law; in other words, the Court must decide whether a reasonable jury could conclude that the government met its burden of proving each element of the offense beyond a reasonable doubt." United States v. Quinn, 403 F.

Supp. 2d 57, 60 (D.D.C. 2005) (quoting United States v. Treadwell, 760 F.2d 327, 333 (D.C. Cir. 1985)); see also Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Gomez, 431 F.3d 818, 819 (D.C. Cir. 2005) ("As always with a defendant's claims of insufficient evidence, we review de novo, viewing the evidence in the light most favorable to the government. We affirm if a rational fact-finder could have found guilt beyond a reasonable doubt.").

In relevant part, Fed. R. Crim. P. 33(a) provides that "the [C]ourt may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Unlike a motion for judgment of acquittal, when ruling on a motion for a new trial 'the Court need not accept the evidence in the light most favorable to the government, and [it] may weigh the testimony and may consider the credibility of the witnesses.'" United States v. Howard, 245 F. Supp. 2d 24, 30 (D.D.C. 2003) (quoting United States v. Edmonds, 765 F. Supp. 1112, 1118 (D.D.C. 1991)). "A motion for a new trial is committed to the sound discretion of the trial judge, and should be reversed only for abuse or misapplication of the law." United States v. Mangieri, 694 F.2d 1270, 1285 (D.C. Cir. 1982) (quoting United States v. Reese, 561 F.2d 894, 902 (D.C. Cir. 1977)).

## DISCUSSION

### I.     Motion for Acquittal

The crux of defendant's argument in favor of acquittal is that the evidence presented at trial by the government was insufficient to prove that defendant had constructive possession of the cocaine base. It is well-established in this circuit that "[c]onviction on the basis of constructive possession requires evidence of the defendant's 'ability to exercise knowing dominion and control over the items in question.'" Gomez, 431 F.3d at 820 (quoting United States v. Wahl, 290 F.3d 370, 376 (D.C. Cir. 2002)). In the context of drug possession, "[w]here drugs are found in a place

occupied by more than one person, the evidence must support a belief that 'the accused had a substantial voice vis-a-vis' the drugs . . . or, equivalently, 'some appreciable ability to guide [the drugs'] destiny." Id. (quoting United States v. Staten, 581 F.2d 878, 884 (D.C. Cir. 1978)).  Put another way, "[a]lthough mere proximity to [contraband] is insufficient to establish constructive possession, evidence of some other factor -- including connection with the [contraband], proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise -- coupled with proximity may suffice."  United States v. Booker, 436 F.3d 238, 242 (D.C. Cir. 2006) (quoting United States v. Alexander, 331 F.3d 116, 127 (D.C. Cir. 2003)).  In this case, defendant effectively argues that all the government's evidence proves only "proximity," which in and of itself is insufficient to establish constructive possession.  The government responds that it has demonstrated several "plus" factors that demonstrate more than mere proximity as the basis for defendant's conviction.  As explained below, the government has the better of this argument.

Defendant's argument relies heavily upon Rivas v. United States, 783 A.2d 125 (D.C. 2001).  He cites that case for the proposition that "'mere presence of the accused on the premises, or simply his proximity to the drug, does not itself enable . . . a deduction' beyond a reasonable doubt that [the accused] had the requisite intent."  Id. at 130 (quoting Staten, 581 F.2d at 884).  Instead, defendant maintains, Rivas requires:

> [A] furtive gesture indicating an attempt to access, hide or dispose of the object, flight or other evidence of consciousness of guilt, evidence of participation in an ongoing criminal venture involving the contraband, an inculpatory statement, evidence of prior possession of the item, actual possession of paraphernalia relating to the use or sale of the contraband, control of the area or container in which the contraband is found, or the like.

Id. at 137.  Seizing on that passage, defendant ardently insists that "none of the factors that the Rivas court outlined as sufficient to prove intent along with mere proximity to the drugs" are present in this case.  Def.'s Mot. at 10-11.  Thus, according to defendant, the government's evidence was not adequate to prove constructive possession beyond a reasonable doubt.  As demonstrated below, however, not only does defendant over-read Rivas, at least one of the Rivas factors is in fact present here.

At the outset, it is worth noting that Rivas is not federal authority and it has no binding effect on this Court.  To be sure, the case may be instructive on this issue, but the government is by no means required to satisfy any Rivas criteria.  Instead, the government's burden is outlined by federal cases from this circuit (and from the Supreme Court, naturally).  Be that as it may, defendant attributes far too much weight to Rivas on its own terms.  In that case, the D.C. Court of Appeals disavowed any "special exception for automobiles" in the constructive possession context.  Rivas, 783 A.2d at 131.  The court merely held that "proximity to exposed drugs in a car, without more" is not "sufficient to prove (beyond a reasonable doubt) the requisite intention to exercise dominion or control."  Id.  Thus, the court's explanation of other "plus" factors was simply an elaboration on that holding and should by no means be taken to constitute an exhaustive list.  Indeed, the court took pains to make clear that proximity "plainly" has "bearing on the issue of control," id. at 131 -- it simply may not be the only basis for a conviction.

Even accepting defendant's reading of Rivas, however, the Court concludes that constructive possession is satisfied.  The government evinced evidence that defendant owned both the vehicle (generally) and the shoes (specifically) where the cocaine base was located.  Thus, unlike Rivas, defendant here is the owner (rather than a mere passenger, as in Rivas) of the "area or container in which the contraband [was] found," in Rivas terms.  Id. at 137.  Defendant had the

ability to control that area by virtue of his ownership of it and the ability to exclude (or permit) others from making use of that space.  As the government aptly puts it, "the truck was a place of safekeeping for the defendant's personal items, including his Nike tennis shoes."  Gov't Opp'n at 5.  To be sure, defendant's evidence attempted to cast some doubt on that conclusion by establishing that defendant often let other individuals make use of the car, specifically "David" in this case.  But that evidence alone does not create a reasonable doubt by operation of law.[2]  Viewing the evidence in the light most favorable to the government, as the Court must, a reasonable jury could have found that defendant's proximity to the narcotics, coupled with his ownership of both the vehicle and the shoes that contained the cocaine base, established constructive possession beyond a reasonable doubt.  For similar reasons, those same facts also indicate that defendant had an "appreciable ability to guide [the drugs'] destiny."  Gomez, 431 F.3d at 820 (internal citations omitted).

But that is not the only evidence upon which the government relies.  In addition to ownership and the ability to control both the vehicle and the shoes, the government produced additional circumstantial evidence of constructive possession.  Aside from merely establishing ownership of the Nike shoes, the government demonstrated that "defendant was the major contributor of the genetic material recovered" from the shoes.  Gov't Opp'n at 5.  That is circumstantial evidence of actual use, which goes beyond mere ability to control.  Moreover, the digital scale recovered from the vehicle presents further circumstantial evidence in favor of finding constructive possession of the narcotics.  The government's expert testimony posited that

---

[2] In fact, it is "the rule in this circuit that only the evidence presented as part of the Government's case in chief may be considered" on a motion for acquittal.  United States v. Pardo, 636 F.2d 535, 547 (D.C. Cir. 1980).  The Court mentions defendant's evidence here only to point out that it would be insufficient to create a reasonable doubt as a matter of law in any event.

such digital scales are routinely employed "for efficiently weighing narcotics" and that it was therefore likely that the truck "was being used for drug distribution, rather than for a one time dump of a large amount of valuable contraband by a mysterious individual." Id. at 6.

The government also produced two additional pieces of evidence in this case. First, defendants were found with nearly $2,000 in cash on their persons. As the government's expert witness established, drug deals proceed almost exclusively on a cash-only basis, and the presence of such large quantities of currency lends support to the conclusion that defendant was engaged in drug distribution. Similarly, the presence of non-subscriber cellular telephones also supports that conclusion. As the government's expert explained, such phones are often used to obscure communications by narcotics dealers.

In sum, the government produced evidence that defendant was within close proximity to the narcotics at the time he was arrested and that he owned the vehicle and Nike shoes where the drugs were found. In addition, defendants were found with a large quantity of cash, a digital scale, and several cellular telephones, all of which are indicia of drug distribution according to the government's expert witness. On this record, the Court concludes that a reasonable jury could easily have found that defendant constructively possessed the narcotics found in the vehicle. The evidence permits the conclusion that he was more than a mere bystander to these events. Accordingly, the Court will deny defendant's motion for acquittal.

## II.     Motion for New Trial

Pursuant to Fed. R. Crim. P. 33, the Court may set aside the jury's verdict and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). As explained above, unlike in the motion for acquittal posture, the Court may review the totality of the evidence -- including the credibility of the witnesses who testified at trial -- to determine if a new trial is warranted.

Moreover, the Court need not view the evidence in the light most favorable to the government in this context. Nevertheless, as explained below, the Court will deny defendant's motion for a new trial.

Defendant has a heavy burden under Fed. R. Crim. P. 33(a). As another judge in this District put it, "the evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand . . . . This power should be exercised with caution, and is invoked only in those exceptional cases in which the evidence weighs heavily against the verdict." Howard, 245 F. Supp. 2d at 30 (quoting Edmonds, 765 F. Supp. at 1118). In this case, defendant offers two reasons to set aside the jury's verdict and grant a new trial: (1) a conclusory allegation that "the verdict is contrary to the law and the weight of the evidence . . . [because defendant was found guilty] without evidence that he knew the drugs were in the vehicle nor that he intended to possess the drugs," Def.'s Mot. at 12; and (2) that this Court erred by giving the jury an instruction that the stop and search of the vehicle was lawful. Neither reason is persuasive.

The first justification put forward by defendant is little more than a rehash of his arguments for acquittal. Although the Court need not consider the evidence in the light most favorable to the government for Rule 33 purposes, defendant has nevertheless failed to demonstrate the evidence weighs against the verdict. Defendant's evidentiary showing is apparently designed to demonstrate that David, or some other unidentified individual, placed the cocaine base in defendant's truck without defendant's knowledge. To establish that, defendant introduced evidence that David had access to the truck on the morning of August 17, 2007 and that he returned the keys to defendant at some point in the afternoon.[3] Presumably, defendant's

---

[3] Indeed, it is unclear what time this supposed transaction occurred. Defendant was forced to impeach his own witness, Kimberly Juggins, when she indicated that the key hand-off occurred

-10-

Case 1:07-cr-00235-JDB   Document 57   Filed 01/30/08   Page 11 of 12

theory is that David placed the cocaine base in defendant's shoe while he had access to the truck on the morning of August 17th. Unfortunately, defendant's evidence does not come close to proving that theory. There is no evidence linking the narcotics to David, and defendant's asserted motive for David's actions is specious at best. On this record, a jury would be forced to speculate to reach defendant's account of these events. In short, the evidence falls far short of preponderating against the verdict (or even negating the government's case in chief).

Defendant's second argument fares no better. He insists that the Court erred by instructing the jury that the stop and search of defendant's vehicle was lawful.[4] That is so, the argument goes, because the instruction improperly "place[d] the Court's imprimatur on an essential aspect of the jury's consideration of the charge against [defendant] by suggesting that the traffic violation did in fact occur, and that the officers did in fact smell marijuana, and that the officers did in fact find drugs in the truck." Def.'s Mot. at 12. In turn, the instruction also supposedly stripped the jury of its ability to be "completely free to consider the testimony and credibility of Officer Durham and Officer Foultz against the testimony [of] Mr. Williams, who testified that he initiated his left turn signal." Id. Moreover, according to defendant, the instruction improperly suggested that the

---

prior to 1:00 p.m. For her part, Benita Williams' testimony does not establish a definitive timeline either because she merely indicated that she gave inhalers to defendant at some point between 1:00 p.m. and 4:00 p.m. Officer Durham saw defendants enter the truck at 4:20 p.m.

[4] The Court's instruction was as follows:
As I have instructed you, it is my responsibility to rule on legal questions. In that regard, I have already determined as a matter of law that the stop and search of the Ford pick-up truck by the police officers, and the arrests of the defendants, were lawful. To the extent that you consider the facts surrounding the stop, search, and arrests to be relevant in your role as finders of fact, it is your job to determine what those particular facts are.

"officers did in fact find the drugs in the car," thus depriving the jury of the possible conclusion "that the officers planted the drugs in the truck." Id. at 13.

Defendant's contentions are without merit. To begin with, it is the Court's role to decide legal questions, such as the lawfulness of a traffic stop. Contrary to defendant's assertions, it would have been improper to permit the jury to consider whether the stop and search in question were lawful during their deliberations. In any event, to avoid any undue prejudice to defendant, the Court instructed the jury that it was permitted to make an independent determination of the facts surrounding the stop and search, provided that those facts were relevant to the jury's role as fact-finders. Finally, the Court also instructed the jury that it was up to the individual jurors themselves to weigh the credibility of any witness in the case, including the various officers. The suggestion that the Court somehow forced the jury to regard the officers as credible is baseless. Simply put, defendant's asserted trial error cannot support granting his motion for a new trial. Accordingly, the Court will deny defendant's Rule 33 motion.

## CONCLUSION

Upon consideration of [54] defendant's motion for acquittal, or in the alternative, for a new trial, the opposition thereto, the entire record herein, and for the foregoing reasons, it is hereby **ORDERED** that the motion is **DENIED**.

**SO ORDERED**.

                                                /s/
                                   JOHN D. BATES
                            United States District Judge

Dated: January 30, 2008